Joseph J. Tabacco, Jr. (SBN 75484)
Todd. A. Seaver (SBN 271067)
**BERMAN DEVALERIO**
One California Street, Suite 900
San Francisco, CA  94111
Telephone: (415) 433-3200
Facsimile:  (415) 433-6282
Email:   jtabacco@bermandevalerio.com
          tseaver@bermandevalerio.com

*Liaison Counsel for the Putative Classes*

Simon Bahne Paris (admitted *pro hac vice*)
Patrick Howard (admitted *pro hac vice*)
Charles J. Kocher (admitted *pro hac vice*)
**SALTZ, MONGELUZZI, BARRETT
& BENDESKY, P.C.**
One Liberty Place, 52nd Floor
1650 Market Place
Philadelphia, PA19103
Telephone: (215) 575-3985
Facsimile: (215) 496-0999
Email: sparis@smbb.com
 phoward@smbb.com
 ckocher@smbb.com

*Interim Lead Class Counsel for the Putative class*

*(Additional counsel listed on signature page)*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| JASON TRABAKOOLAS, SHEILA STETSON, CHRISTIE WHEELER, JACK MOONEY, and KEVEN TURNER individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs<br>   v.<br><br>WATTS WATER TECHNOLOGIES, INC., WATTS REGULATOR CO., WOLVERINE BRASS, INC., AND JOHN DOES 1-100.<br><br>                    Defendants. | Case No. 4:12-cv-01172-YGR (EDL)<br><br>CLASS ACTION<br><br>**[REDACTED] PLAINTIFFS' MOTION TO COMPEL DISCOVERY**<br><br>Date:            July 16, 2013<br>Time:            9:00 a.m.<br>Courtroom:     E, 15th Floor<br>Magistrate Judge Elizabeth D. Laporte<br><br>Action Filed:     March 8, 2012 |

**TABLE OF CONTENTS**

**Page**

I.    NOTICE .................................................................................................................1

II.   RELIEF SOUGHT ................................................................................................1

III.  FACTS ..................................................................................................................2

    A.    Relevant Case Background ...........................................................................2

    B.    Relevant Discovery Background ...................................................................3

        1.    Plaintiffs' discovery and the Watts productions................................3

        2.    Watts' privilege and work product claims.......................................4

IV.   ARGUMENT .......................................................................................................5

    A.    Authority......................................................................................................5

        1.    The attorney-client privilege .........................................................6

        2.    The work product doctrine .............................................................7

        3.    Standards for privilege logs...........................................................8

        4.    Requirements for *in camera* inspection.........................................9

    B.    Watts Has Used the Attorney-Client Privilege and Work Product Doctrine Improperly to Suppress Discoverable Material. ................................................9

        1.    The Clawback Documents, and related documents on privilege log, are routine business documents that the court should review *in camera* to evaluate Watts' claims.................................................................9

            a.    The PowerPoints..............................................................10

                (1)    The documents were produced in the ordinary course of business and contained facts, not attorney work product. ......11

                (2)    The PowerPoints do not meet the "in anticipation of litigation" standard. ...........................................................12

                (3)    Plaintiffs have a substantial need for the PowerPoints..........14

                b.    Emails. ...........................................................................14

                (1)    W0060508 ...............................................................14

                (2)    W0019724 ...............................................................15

                (3)    W0119530 ...............................................................15

2.  The claims files must be produced with some exceptions. ............................16

    a.  Materials prepared by Watts in the ordinary course of business receive no protection under the attorney-client privilege or the work product doctrine. ......................................................................16

    b.  Even if the claims files were not business documents, Watts has waived any claim that they are privileged or protected by voluntary production of its claims files and injection of claims data and outcome into this lawsuit. ...............................................................19

    c.  Plaintiffs have a substantial need for the withheld claims files to prepare their case and cannot obtain the substantial equivalent of the claims files elsewhere .................................................19

3.  Communications between non-legal employees are business communications are not protected. ..............................................................20

4.  Watts has improperly withheld spreadsheets comprised of factual data as "attorney work product." ...........................................................................21

5.  Watts has withheld other documents based on erroneous claims of privilege and work product. ..................................................................................23

    a.  Privilege Log 1, Nos. 226, 242 ........................................................23

    b.  Privilege Log 1, Nos. 57, 58, 1098 ..................................................23

    c.  Privilege Log 1, Nos. 762-774 .........................................................24

V.  CONCLUSION ................................................................................................25

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>PAGE(S)</u>

3

**Cases**

4

*Burlington N. & Santa Fe Ry. v. United States Dist. Court*,
   408 F.3d 1142 (9th Cir. 2005) .................................................................................................. 8

5

6

*Clarke v. Am. Commerce Nat'l Bank*,
   974 F.2d 127 (9th Cir. 1992) ..................................................................................................... 7

7

*Costco Wholesale Corp. v. Super. Ct.*,
   47 Cal. 4th 725 (2009) ........................................................................................................ 6, 9

8

9

*Cox v. Zurn Pex Inc.*, No 07-cv-3652(ADM/RLE) (D. Minn. July 28, 2008) ................................ 17

10

*Diagnostics Sys. Corp. v. Symantec Corp.*,
   NO. SA CV 06-1211 DOC (ANx), 2008 U.S. Dist. LEXIS 123915 (C.D. Aug. 12. 2008) ... 7, 20

11

*Fox v. Cal. Sierra Fin. Servs.*,
   120 F.R.D. 520 (N.D. Cal. 1988) .......................................................................................... 7, 12

12

*Fru-Con Constr. Corp. v. Sacramento Mun. Util. Dist.*,
   No. S-05-0583 LKK GGH, 2006 U.S. Dist. LEXIS 53763 (E.D. Cal. July 20, 2006) .......... 17, 18

13

14

*Garcia v. City of El Centro*,
   214 F.R.D. 587 (S.D. Cal. 2003) ............................................................................................. 18

15

*Hertzberg v. Veneman*,
   273 F. Supp. 2d 67 (D.D.C. 2003) ........................................................................................... 13

16

*HSS Enterprises, LCC v. Amco Ins. Co.*,
   2008 U.S. Dist. LEXIS 11841, 2008 WL 163669 (W.D. Wash. Jan. 14, 2008) ....................... 17

17

18

*In re Grand Jury Subpoena*,
   974 F.2d 1068 (9th Cir. 1992) ................................................................................................... 6

19

*Ivy Hotel San Diego, LLC v. Houston Cas. Co.*,
   No. 10-cv-2183-L (BGS), 2011 U.S. Dist. LEXIS 119746 (S.D. Cal. Oct. 17, 2011) .............. 17

20

21

*Janicker v. George Washington Univ.*,
   94 F.R.D. 648 (D.D.C. 1982) ................................................................................................... 18

22

*Kandel v. Brother Int'l Corp.*,
   683 F. Supp. 2d 1076 (C.D. Cal. 2009) ................................................................................. 6, 7

23

24

*Kannaday v. Ball*,
   No. 12-2742-RDR, 2013 U.S Dist. LEXIS 48140 (D. Kan. Apr. 3, 2013) .................................. 7

25

*Lanier v. Clovis Unified Sch. Dist.*,
   No. 11-cv-01613-LJO-GSA, 2013 U.S. Dist. LEXIS 65171 (E.D. Cal. May 7, 2013) ............... 8

26

27

28

*Miller v. Pancucci,*
    141 F.R.D. 292 (C.D. Cal. 1992) ........................................................... 13

*Mission Nat'l Ins. Co. v. Lilly,*
    112 F.R.D. 160 (D. Minn. 1986) ........................................................... 17

*Molex v. City & County of San Francisco,*
    No. 11-cv-1282-YGR (KAW), 2012 U.S. Dist. LEXIS 70006 (N.D. Cal. May 18, 2012) ........ 16

*Onwuka v. Fed. Express Corp.,*
    178 F.R.D. 508 (D. Minn. 1997) ........................................................... 18

*Phillips v. C.R. Bard, Inc.,*
    No. 12-cv-00344-RCJ-WGC, 2013 U.S. Dist. LEXIS 45647 (D. Nev. Mar. 28, 2013) .............. 13

*SmithKline Beecham Corp. v. Pentech Pharms., Inc.,*
    No. 00 C 2855, 2001 U.S. Dist. LEXIS 18281 (N.D. Ill. Nov. 6, 2001) ...................................... 13

*Thelen Reid & Priest LLP v. Marland,*
    No. C 06-2071 VRW, 2007 U.S. Dist. LEXIS 17482 (N.D. Cal. Feb. 21, 2007)........................ 6

*Umpqua Bank v. First Am. Title Ins. Co.,*
    No. CIV S-09-3208 WBS EFB, 2011 U.S. Dist. LEXIS 34088 (E.D. Cal. Mar. 17, 2011) ... 7, 17

*United States v. Bell,*
    No. C 94-20342 RMW, 1994 U.S. Dist. LEXIS 17408 (N.D. Cal. 1994) ........................... 6, 7, 8

*United States v. Bergonzi,*
    216 F.R.D. 487 (N.D. Cal. 2003) ........................................................... 13

*United States v. Chevron Texaco Corp. (Chevron Texaco),*
    241 F. Supp. 2d 1065 (N.D. Cal. 2002)........................................................... 6, 7, 20, 22

*United States v. Zolin,*
    491 U.S. 554 (1989) ........................................................... 9

*Vieste, LLC v. Hill Redwood Dev.,*
    No. C-09-04024 JSW (DMR), 2010 U.S. Dist. LEXIS 126607 (N.D. Cal. Nov. 18, 2010)........................................................... 6, 8

*Visa U.S.A., Inc. v. First Data Corp.,*
    No. C-02-1786 JSW (EMC), 2004 U.S. Dist. LEXIS 17117 (N.D. Cal. Aug. 23, 2004)............. 6

*Wellpoint Health Networks, Inc. v. Super. Ct.,* 59 Cal. App. 4th 110 (1997) ....................... 6, 19, 22

*Zurich Am. Ins. Co. v. Super. Ct.,*
    155 Cal. App. 4th 1485 (2007)........................................................... 6

**Statutes**

8 Wright & Miller, Federal Practice Procedure, Civil, § 2017 ....................................... 17

Cal. Bus. & Prof. Code § 17200 ........................................................... 2

Cal. Civ. Code § 1750 ............................................................................................ 2

Cal. Civ. Code § 1792 ............................................................................................ 2

Cal. Evid. Code § 954 ............................................................................................ 6

Fed. R. Civ. P. 26(b)(3) ......................................................................................... 7

Fed. R. Civ. P. 26(b)(3)(A)(ii) ......................................................................... 8, 14

Fed. R. Civ. P. 26(b)(5)(B) ............................................................................... 10

# I.    NOTICE

PLEASE TAKE NOTICE that on July 16, 2013 at 9:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom E on the 15th Floor of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, Plaintiffs Jason Trabakoolas, Sheila Stetson, Christie Wheeler, Jack Mooney, and Keven Turner, on behalf of themselves and a proposed class of similarly situated persons ("Plaintiffs"), will respectfully move this Court for an order compelling production of several categories of documents defendants Watts Water Technologies, Inc., Watts Regulator Co. and Wolverine Brass, Inc. ("Watts") has improperly withheld under the guise of the attorney-client privilege and/or work product doctrine.[1]  This Motion will be based on this Notice; the accompanying Memorandum of Points and Authorities in Support of Plaintiffs' Motion, and the supporting evidence filed herewith; the Court's file in this action; and other argument or evidence presented at the hearing on the Motion.

# II.    RELIEF SOUGHT

Plaintiffs request the Court to order Watts to produce several categories of documents which Watts has improperly withheld under the guise of the attorney-client privilege and/or work product doctrine.  The categories include:  (1) claims files, except:  (a) communications that include outside counsel, (b) legal documents in draft form, and (c) internal communications related to paying judgment for litigation or arbitration; (2) communications between non-legal employees and agents; (3) spreadsheets compiling factual data; and (4) other miscellaneous documents.  Each category is described below.  Alternatively, Plaintiffs ask the Court to conduct an *in camera* review of the documents in these categories.[2]

---

[1] Plaintiffs are filing concurrently herewith a Motion to Shorten Time pursuant to Local Rule 6-3 requesting that the Court modify the hearing and briefing schedule on this motion.

[2] The categories cover a large volume of documents.  Therefore, Plaintiffs address their challenges to Watts' assertions of privilege and the work product document categorically.  Decl. of Simon Bahne Paris in Supp. of Motion to Compel Discovery ("Paris Decl."), filed herewith, ¶ 27.  To do otherwise would be impractical.  If the Court decides to conduct an *in camera* review, Plaintiffs propose that Plaintiffs and Watts each select ten to twenty representative documents for each category for the Court's consideration.  Plaintiffs believe that with Court guidance on the categories, the parties should be able to resolve their disputes.

In addition, Plaintiffs ask the Court to conduct an *in camera* review of seven documents Watts claims are protected by the attorney-client privilege or the work product doctrine and inadvertently produced (the "Clawback Documents").

### III.   FACTS

**A.    Relevant Case Background**

Proposed class representatives are all homeowners who suffered damages when a Watts-designed plastic coupling nut on a toilet connector installed in their homes cracked causing damage. Because the toilet connector is under positive water pressure at all times, water ran into the homes unabated from the cracked plastic coupling nut until manually shut off.

Plaintiffs allege that Watts knew that the design of the plastic coupling nut was defective, modified the design to address these defects, but did not warn or advise consumers about the defects or issue a recall to replace the toilet connectors with the defective plastic coupling nut.[3] In the years before Plaintiffs filed this proposed class action, homeowners and their insurers submitted thousands of nearly identical claims to Watts for reimbursement of losses caused by the failed plastic coupling nut. Watts handled these claims internally in its Risk Management Department, with the assistance of its third-party claims administrator, ESIS, Inc. Watts was self-insured to a certain level. Watts received the claims directly, reviewed the claims in-house, conducted its own investigations, and then determined whether it would accept or deny the claims. Watts rarely accepted a claim, but instead, nearly universally denied the claims by blaming the property owner for improperly installing the toilet connector by over-tightening it. This is Watts' claims process and takes place before any litigation or arbitration was initiated. Paris Decl. ¶ 3.

As a result of the high volume of claims that Risk Management processed, Watts was on notice, as early as 2003, of defects in the design of the plastic coupling nut affixed to its toilet connector, but did not take steps to change the design of the plastic coupling nut until 2008. Even

---

[3] Plaintiffs' Second Amended Complaint ("SAC") seeks relief under the California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.* (Count IV); California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 (Count V); the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1792 (Count VI); as well as other state consumer protections acts, and common law. (ECF No. 130.)

after the re-designed plastic coupling nut entered the market in 2009, Watts did not recall the defective plastic coupling nuts with the old design or take any action to ensure these defective products were removed from retail shelves.  Paris Decl. ¶ 4.  Instead, Watts recognized it confronted a decade of claims liability from the old design of the plastic coupling nut at issue in this litigation.  *Id.* Ex. A.  These defective toilet connectors remain stocked on the shelves at home do-it-yourself centers across the country, while claims continue to roll in.  *Id.* ¶ 4.

**B.      Relevant Discovery Background**

       **1.      Plaintiffs' discovery and the Watts productions**

After filing the initial Complaint on March 8, 2012, Plaintiffs served their First Request for Production of Documents on Watts on June 29, 2012.  Paris Decl. ¶ 5.  After an extension, Watts provided its written responses on August 3, 2012.  *Id.*  Watts was slow to produce documents.  *Id.*  After several meet and confers, the parties filed a joint submission with the Court on November 28, 2012, outlining the status of discovery.  In the submission, Watts advised the Court that it expected to "(i) complete an initial production of ESI during the first week of December 2012; (ii) complete the second of their ESI production before December 25, 2012; and (iii) complete the remainder of their hard copy document production, … during the first week of December [2012]."  (ECF No. 105 ¶ 3.)  In that same submission, Watts further advised that it anticipated being able to produce the "claims files" related to the toilet connectors "in mid to late January of 2013."  (*Id.* ¶ 4.)   The parties further agreed to "exchange privilege logs on January 18, 2013."  (*Id.* ¶ 1.)

Plaintiffs received Watts' first ESI production on Monday, December 10 and its second on Monday, December 24; however, Watts advised for the first time (and contrary to the Court submission) that it would be making additional ESI productions at undetermined times.  Paris Decl. ¶ 5.  More than a month later, on Monday, January 28, 2013, Plaintiffs received yet another ESI production; and on March 16, 2013, Watts made a final production and certified its ESI production as complete.  Watts has produced a total of 18,635 pages (not documents) of responsive ESI.  *Id.*

As for the claims files, Watts made three productions of toilet connector claims files during the month of February.  Paris Decl. ¶ 6.  On May 13, 2013, Watts made another (unexpected) 11,000 page production of toilet connector claims files.  *Id.*  All told, Watts has produced only

38,764 documents in electronic format which are alleged to be responsive to Plaintiffs' document requests covering a time period of more than 10 years.[4]  *Id*.

### 2.   Watts' privilege and work product claims

Watts has invoked the attorney-client privilege and work product doctrine to withhold nearly 4,000 documents.  The size of the withheld collection is staggering relative to the number of documents actually produced.  Beginning on January 18, 2013, Watts produced three privilege logs that cover more than 500 pages.[5]  Paris Decl. *in passim*.  The two largest privilege logs (1 & 2) each have been revised and expanded at least twice.  With few exceptions, Watts' "privilege descriptions" for all of the 4,000 entries are repetitive, generic boilerplate.  *See generally id*. Exs. C, E, K.  Watts does not provide separate document descriptions or subject matter detail, instead Watts relies on one word references such as "email," "spreadsheet," or "invoice"; and short, general phrases such as "regarding active toilet connector litigation," "regarding connector claims." *Id*.  The logs do not include Bates numbers for the documents.  *Id*.  Watts says it did not number the withheld documents and is not obligated to do so.  *Id*. ¶¶ 10, 18.

On January 18, 2013, Watts produced a privilege log.  Paris Decl. ¶ 10.  Watts described the log as documents withheld from its ESI production.  *Id*.  After the parties first discussed the log, Watts agreed to "revise" Privilege Log 1 and expanded it to 1,630 entries on March 27, 2013.  *Id*. On May 10, Watts revised the log a third time.  *Id*.  The most recent version of the log contains 1,629 entries and is nearly 200 pages long.  *Id*. ¶ 10 & Ex. C.

Watts produced its Clawback Log on March 15 in connection with its claim that it had inadvertently produced 7 documents.  Paris Decl. ¶ 12 & Ex. E.  Watts did not make the claim until Plaintiffs referenced one of the documents during the February 20, 2013 mediation.  *Id*. ¶ 12.  Even though it was clear on the documents' faces that, with one exception, they were not privileged or

---

[4] Watts has made an additional hard copy document production of fewer than 3,000 pages.

[5] For the Court's convenience, Plaintiffs refer to the logs as Privilege Log 1, Privilege Log 2, and the Clawback Privilege Log in this motion.  Plaintiffs attach excerpts of the most recent versions of Privilege Logs 1 and 2 and the entire Clawback Privilege Log to the Paris Declaration as Exhibits C, K, and E respectively.  The excerpts include only the privilege and work product claims Plaintiffs challenge.  Plaintiffs also provide a table of Watts outside counsel, employees and consultants, and other individuals Watts identifies on the Privilege Logs.  Watts provided the table at Plaintiffs' request in lieu of organization charts.  Paris Decl. Ex. O.

work product, lead counsel immediately retrieved all hard copies of the documents, sequestered them, and had electronic copies of the documents removed from the case document server. *Id.* ¶ 13. Watts again recently claimed that it inadvertently produced an additional document. *Id.* ¶ 17 & Ex. J.

Watts surprised Plaintiffs with an additional privilege log on April 15. Paris Decl. ¶ 18 & Ex K. Privilege Log 2 originally contained 1,820 entries. *Id.* Watts described the log as documents withheld from its production of claims files. *Id.* Watts revised this privilege log two times. The most recent edition of Privilege Log 2, dated May 10, 2013, is 277 pages long and has expanded to 2,155 entries.[6] *Id.*

Watts' responses to Plaintiffs' requests to update the log with more specifics yielded no better detail. Nevertheless, Plaintiffs have gone over the entries and conferred extensively with Watts in-person, via telephone, and in writing. Paris Decl. ¶ 30. Plaintiffs conducted a telephonic meet and confer on April 15 and conferred about the three Watts' logs in-person on April 1, May 6, and May 13. *Id.* ¶ 31. In addition, the parties have exchanged dozens of written communications about the logs. *Id.* As a result of the process, Plaintiffs believe that hundreds of the 4,000 attorney-client and work product claims are improper for the reasons set forth in this motion. At the May 13 Case Management Conference, Plaintiffs and Watts asked the Court to assign the matter to a magistrate for resolution. *Id.* ¶ 32

On May 22, 2013, this Court ordered the parties to confer again in an effort to narrow the dispute. (ECF No. 138.) The parties conferred on June 3, 2013, but were not able to resolve their differences.

## IV.     ARGUMENT

### A.     Authority

The standards governing the attorney-client privilege and work product doctrine are well-known to the Court and to the parties. Federal courts sitting in diversity apply the law of the forum state on attorney-client privilege issues and apply federal common law to attorney work product

---

[6] Watts recently made another production of documents and has not advised Plaintiffs whether it intends to supplement its privilege logs further, or to produce other privilege logs.

1   issues.  *Thelen Reid & Priest LLP v. Marland*, No. C 06-2071 VRW, 2007 U.S. Dist. LEXIS

2   17482, at *15 (N.D. Cal. Feb. 21, 2007).  The party asserting the privilege or protection bears the

3   burden to establish its claims.  *Kandel v. Brother Int'l Corp.*, 683 F. Supp. 2d 1076, 1082 (C.D.

4   Cal. 2009); *Costco Wholesale Corp. v. Super. Ct.*, 47 Cal. 4th 725, 733 (2009); *United States v.*

5   *Bell*, No. C 94-20342 RMW, 1994 U.S. Dist. LEXIS 17408, at *18 (N.D. Cal. 1994).  To carry that

6   burden, that party must present "detailed facts which make clear that the specifically identified and

7   described documents are protected under the doctrine."  1994 U.S. Dist. LEXIS 17408, at *18

8   (citation and internal quotation marks omitted).

9          **1.       The attorney-client privilege**

10          The attorney-client privilege is strictly limited.  The attorney-client privilege protects

11   confidential disclosures made by a client to an attorney in order to obtain legal advice.  *In re Grand*

12   *Jury Subpoena*, 974 F.2d 1068, 1070 (9th Cir. 1992); *see also Vieste, LLC v. Hill Redwood Dev.*,

13   No. C-09-04024 JSW (DMR), 2010 U.S. Dist. LEXIS 126607, at *8 (N.D. Cal. Nov. 18, 2010);

14   Cal. Evid. Code § 954.  The privilege applies only:  "(1) when legal advice of any kind is sought

15   (2) from a professional legal adviser in his or her capacity as such, (3) the communications relating

16   to that purpose, (4) made in confidence (5) by the client, (6) are, at the client's instance,

17   permanently protected (7) from disclosure by the client or by the legal adviser (8) unless the

18   protection be waived."  *Visa U.S.A., Inc. v. First Data Corp.*, No. C-02-1786 JSW (EMC),

19   2004 U.S. Dist. LEXIS 17117, at *12 (N.D. Cal. Aug. 23, 2004) (citation and internal quotation

20   marks omitted).  The mere fact that counsel is copied on a communication "will not shield

21   communications not made for the purpose of securing legal advice."  *United States v. Chevron*

22   *Texaco Corp. (Chevron Texaco)*, 241 F. Supp. 2d 1065, 1075 (N.D. Cal. 2002).  Likewise,

23   documents that are prepared independently do not become protected just because they are turned

24   over to counsel.  *Wellpoint Health Networks, Inc. v. Super. Ct.*, 59 Cal. App. 4th 110, 119 (1997).

25          The privilege extends to legal advice outside of litigation, but for the communication to be

26   privileged where a corporate entity is the client, the dominant purpose must be for transmittal to an

27   attorney in the attorney's legal role.  *Wellpoint*, 59 Cal. App. 4th at 120; *Zurich Am. Ins. Co. v.*

28   *Super. Ct.*, 155 Cal. App. 4th 1485 (2007).  Not every communication between an attorney and

1    client is privileged; only confidential communications made for the purpose of seeking or giving

2    legal advice are protected.  *Clarke v. Am. Commerce Nat'l Bank*, 974 F.2d 127, 129 (9th Cir.

3    1992); *see also Kannaday v. Ball*, No. 12-2742-RDR, 2013 U.S Dist. LEXIS 48140, at *16 (D.

4    Kan. Apr. 3, 2013).  The privilege does not apply if the lawyer is merely acting as a business agent

5    of the client.  *Zurich*, 155 Cal. App. 4th at 1504.  The multiple roles of in-house counsel within a

6    corporation raise unique considerations.  In-house counsel may serve both business and legal

7    functions.  Therefore, courts routinely subject claims of privilege related involving in-house

8    counsel to closer scrutiny.  There is no presumption of privilege for their communications.

9    *Diagnostics Sys. Corp. v. Symantec Corp.*, NO. SA CV 06-1211 DOC (ANx), 2008 U.S. Dist.

10   LEXIS 123915, at *31 (C.D. Aug. 12. 2008); *see also Chevron Texaco,* 241 F. Supp. 2d at 1069.

11           **2.       The work product doctrine**

12           The work product doctrine protects material obtained and prepared by an attorney or the

13   attorney's agent in anticipation of litigation or preparation for trial under some circumstances.  Fed.

14   R. Civ. P. 26(b)(3); *Kandel*, 683 F. Supp. 2d at 1083.  In order for the "anticipation of litigation"

15   requirement to be met, "more than a remote possibility of litigation" must have existed.  *Fox v.*

16   *Cal. Sierra Fin. Servs.*, 120 F.R.D. 520, 524 (N.D. Cal. 1988).  In addition, the party claiming the

17   privilege must demonstrate that "in light of the nature of the document and the factual situation in

18   the particular case, the document can fairly be said to have been prepared or obtained because of

19   the prospect of litigation."  *Umpqua Bank v. First Am. Title Ins. Co.*, No. CIV S-09-3208 WBS

20   EFB, 2011 U.S. Dist. LEXIS 34088, at *14 (E.D. Cal. Mar. 17, 2011) (citation and internal

21   quotation marks omitted).  "Documents prepared in the ordinary course of business or that would

22   have been created in essentially similar form irrespective of the litigation are not protectable as

23   work product."  *Id.* at 14-15; *see also Bell*, 1994 U.S. Dist. LEXIS 17408, at *13.

24           The work product doctrine offers a qualified immunity, rather than a privilege.  *Kandel*,

25   683 F. Supp. 2d at 1083-84.  The purpose of the work product doctrine is limited.  The work

26   product doctrine "shelters" the attorney's thoughts and creates a "zone of privacy" in which the

27   attorney can prepare her case*.  Chevron Texaco*, 241 F. Supp. 2d at 1081.

28

1    Work product may be discovered if the party seeking to discover the materials can

2    demonstrate a substantial need and the inability to obtain the substantial equivalent from other

3    sources.  241 F. Supp. 2d at 1081; *see also* Fed. R. Civ. P. 26(b)(3)(A)(ii).

4    **3.    Standards for privilege logs**

5    This Court's May 17, 2013 Order Re Discovery Procedures (ECF No. 137) requires that

6    when a party withholds information responsive to a discovery request by claiming that it is

7    privileged or otherwise protected, that party will provide a privilege log that contains the following

8    information specified separately for each document in the log:

9    (a) The name and job title or capacity of the author; (b) The name and job title or
     capacity of each recipient; (c) The date the document was prepared and, if different,
10   the date(s) on which it was sent to or shared with persons other than its author(s);
     (d) The title and description of the document; (e) The subject matter addressed in
11   the document; (f) The purpose(s) for which it was prepared or communicated; and
     (g) The specific basis for the claim that it is privileged.
12

13   (ECF No. 137 at 3:7-14.)  The content of the privilege log should be analyzed for its

14   reasonableness, as it is "intended to forestall needless waste of time and resources, as well as

15   tactical manipulation of the rules and the discovery process." *Burlington N. & Santa Fe Ry. v.*

16   *United States Dist. Court*, 408 F.3d 1142, 1149 (9th Cir. 2005); *see Vieste,* 2010 U.S. Dist. LEXIS

17   126607, at *23-28; *Lanier v. Clovis Unified Sch. Dist.*, , No. 11-cv-01613-LJO-GSA 2013 U.S.

18   Dist. LEXIS 65171, at *8 (E.D. Cal. May 7, 2013) ("Defendant is reminded, further, that 'when

19   advocates attempt to use discovery tools as tactical weapons rather than to expose the facts and

20   illuminate the issues,' the spirit of the discovery rules is violated.").

21   Watts' privilege logs do not provide this information.  Watts insists that its privilege logs

22   are satisfactory, despite the insufficient detail, because the parties stipulated to what would be

23   provided in a privilege log.  (ECF No. 98, § VII.)  Watts misses the point.  A stipulation among

24   parties as to what detail will be provided on a privilege log does not relieve the party asserting the

25   privilege of its legal burden to demonstrate that the document is protected.  To carry that burden,

26   that party must present "detailed facts which make clear that the specifically identified and

27   described documents are protected under the doctrine."  *Bell*, 1994 U.S. Dist. LEXIS 17408

28   (citation and internal quotation marks omitted).  If Watts has detailed facts that establish that

documents are protected, it has had dozens of opportunities to do so and should have. Instead, by providing insufficient and minimal information for its thousands of entries on the privilege logs, Watts has protracted this issue out for nearly five months.

The Court's order regarding discovery procedures a measure of what is required to meet this burden. Watts has not met the burden here.

### 4. Requirements for *in camera* inspection

To justify the effort an *in camera* review entails, the party seeking the review must show facts that support a reasonable, good faith belief that *in camera* inspection will reveal evidence that certain of the disputed evidence are not privileged. *United States v. Zolin*, 491 U.S. 554, 572 (1989). Plaintiffs support their good faith belief here. Where the dominant purpose of a communication is the business purposes of the corporation, there is no protection under the attorney client privilege or work product doctrine. Although the Court cannot order Watts to produce documents claimed to be attorney-client privileged for such an examination, Watts may voluntarily submit in camera to the extent it seeks to maintain the privilege assertion. The Court can order Watts to produce documents it claims are protected work product. *Costco Wholesale Corp. v. Sup. Court*, 47 Cal. 4th 725, 736 (2009).

### B. Watts Has Used the Attorney-Client Privilege and Work Product Doctrine Improperly to Suppress Discoverable Material.[7]

### 1. The Clawback Documents, and related documents on privilege log, are routine business documents that the court should review *in camera* to evaluate Watts' claims.

The original Clawback Documents[8] were the first red flags as to the liberties Watts is taking with the attorney-client privilege and the work product doctrine. The contents and the context of

---

[7] Plaintiffs have been selective in the privilege log entries they ask the Court to resolve. Paris Decl. ¶ 28. There are hundreds of other documents Watts has withheld based on improper privilege and work product claims. *Id*. For example, Watts has withheld check requests and copies, invoices, and fax cover sheets on the basis of attorney-client privilege and/or work product (nearly 100 documents in total). *Id*. Plaintiffs do not ask the Court to resolve these improper assertions. Again, Plaintiffs hope that with the Court's guidance, the parties can resolve their differences related to all categories. *Id*. ¶ 29.

[8] There are seven Clawback Documents at issue in total. Paris Decl. ¶ 12 & Ex. E. If the Court accepts review of these documents, Watts should provide them to the Court, or Plaintiffs can file them under seal pursuant to Rule 26(b)(5)(B).

1    the documents do not establish that they were prepared "in anticipation of litigation."  Further,

2    none reflects the giving or seeking of legal advice.  In fact, the documents' contents establish that

3    they are routine communications created in the ordinary course of Watts business.  The context

4    establishes that most were documentation of a Watts business improvement project related to its

5    suffering connector business.  These documents reflect the company's fear of what damage the

6    defective toilet connector claims volume might inflict on Watts' reputation and profits.

7         Plaintiffs ask the Court to evaluate the Clawback Documents, and related documents under

8    seal *in camera* pursuant to Rule 26(b)(5)(B).

9         **a.     The PowerPoints.**

10        Four of the Clawback Documents are PowerPoints, different dates and version, entitled

11   ████████████████████████████████████████████████████████████[9]

12   ████████████████████████████████████████████████████████████████ Watts'

13   privilege log descriptions for the four are identical: "PowerPoint presentation relating to counsel-

14   directed review of connector claims, in anticipation of further litigation relating to connector

15   claims."  Paris Decl. Ex. E.  Plaintiffs compared Watts' claims concerning the Clawback

16   PowerPoints to Privilege Log 1 and conclude that Watts has also withheld similar PowerPoints, as

17   well as related correspondence.[10]  *See id.* ¶ 25.  All documents in this category should be analyzed

18   together.  Watts claims that the PowerPoints are attorney work product, but not attorney-client

19   privileged,[11] and that the emails related to the PowerPoints are privileged.  *See id.* Ex. I.

_____

20   [9] W0014854, W0014856, W0014858, W0014859.  *See* Paris Decl. Ex. E.

21   [10] Privilege Log 1, Nos. 22, 216, 255, 259-263, 270, 565, 566, 791, 793, 795, 796, 798, 799,
22   803-806, 883, 890, 891, 894, 898, 925, 926, 984-989, 991, 1071.  For the Court's convenience,
     Plaintiffs provide a table of Watts' privilege log entries for these documents.  Paris Decl. Ex. I.
22   Watts acknowledges that some of these documents are related:  Privilege Log 1, Nos. 22, 183, 216,
23   255, 259-263, 270, 565, 566, 883, 890, 891, 894, 898, 925, 936.  Paris Decl. Ex. T at 1.

24   [11] There is one exception.  Watts claims that Privilege Log 1, No. 806 is attorney-client
     privileged and not work product, even though the Watts privilege description for the document is
25   identical to the description for the other withheld PowerPoints:  "PowerPoint presentation relating
     to counsel-directed review of connector claims, in anticipation of further litigation relating to
26   connector claims."  Paris Decl. Ex. I.  Watts identifies neither the date nor author of No. 806.  *Id.*
     There are other irregularities in Watts' privilege log entries for these documents.  For some of the
27   communications Watts claims attorney-client privilege, without alleging that it relates in any way to
     legal advice (22, 216, 565, 566, 890, 891, 894, 898, 925) and where an attorney appears only as a cc
     (803) and where no lawyer, and sometimes no recipient whatsoever, appears on the privilege log
28   (883 926, 1071). *See id.*

**(1)     The documents were produced in the ordinary course of business and contained facts, not attorney work product.**

Watts cannot establish that these documents are attorney work product.  The content and context of the PowerPoints establish that they were created in the ordinary course of business. Jason Morton, Watts' director of Quality Assurance, created the documents during a period when Watts was in crisis due to claims volume related to its connector businesses.  The project purpose was to uncover and remediate the root causes of these recurring connector failures. [12]

[13]

---

[12] Plaintiffs describe the document from memory.  When Watts recalled the PowerPoints and other documents, Plaintiffs sequestered all copies pending resolution of the dispute. This is true for all of the clawback documents.  Plaintiffs' inability to quote and cite to the document directly is one reason *in camera* review by the Court is appropriate.

[13] Paris Decl. at 1 n.1 & Ex. A.



**(2)      The PowerPoints do not meet the "in anticipation of litigation" standard.**

Even if the PowerPoints had a potential legal use, an unsupported assumption, the documents are not necessarily protected work product. The "in anticipation of litigation" standard requires more than the remote possibility of litigation. *Fox*, 120 F.R.D. at 524. "Most courts

---

1    which have confronted the issue conclude that some remote prospect of litigation is not sufficient."

2    *Phillips v. C.R. Bard, Inc.*, No. 12-cv-00344-RCJ-WGC, 2013 U.S. Dist. LEXIS 45647, at *44-46

3    (D. Nev. Mar. 28, 2013); *see United States v. Bergonzi*, 216 F.R.D. 487, 494-98 (N.D. Cal. 2003)

4    (concluding that investigation conducted by attorneys was in response to securities fraud suits

5    being filed against company, therefore, the work product doctrine was implicated).  It is not enough

6    for a company to "anticipate litigation" because it has released defective products into the

7    marketplace and is beginning to feel the consequences. *See*, *e.g.*, *Miller v. Pancucci*, 141 F.R.D.

8    292 (C.D. Cal. 1992) (concluding that police department documents prepared in ordinary course of

9    internal affairs investigation in response to citizen complaint were not prepared in anticipation of

10   specific litigation, so they were not entitled to work product protection); *Hertzberg v. Veneman*,

11   273 F. Supp. 2d 67, 75 (D.D.C. 2003) ("While litigation need not be imminent or certain in order to

12   satisfy the anticipation-of-litigation prong of the test, this circuit has held that at the very least

13   some articulable claim, likely to lead to litigation, must have arisen, such that litigation was fairly

14   foreseeable at the time the materials were prepared.") (citation and internal quotation marks

15   omitted); *SmithKline Beecham Corp. v. Pentech Pharms., Inc.*, No. 00 C 2855, 2001 U.S. Dist.

16   LEXIS 18281 (N.D. Ill. Nov. 6, 2001) ("[T]o be subject to workproduct immunity, documents

17   must have been created in response to 'a substantial and significant threat' of litigation, which can

18   be shown by 'objective facts establishing an identifiable resolve to litigate.' Documents are not

19   work-product simply because 'litigation [is] in the air' or there is a remote possibility of some

20   future litigation.") (citations omitted).  Moreover, if there are significant consequences from the

21   defective products, that becomes a business issue that must be analyzed.

22          The company's routine processing of claims cannot be presumed to be "in anticipation of

23   litigation."  For a risk management department's claims investigation and processing to have any

24   integrity, the receipt of a claim for a failed product cannot be the equivalent of "in anticipation of

25   litigation."  Upon receipt of the claim, a legitimate procedure would be to conduct an unbiased

26   investigation of the claim with Watts paying the claim *without litigation or arbitration if the claim*

27   *was legitimate.*

28

Significantly, neither the PowerPoints nor the Privilege Logs cite any particular litigation, further undermining Watts' argument that the PowerPoints were created "in anticipation of litigation."

**(3)      Plaintiffs have a substantial need for the PowerPoints**

Finally, Plaintiffs have a substantial need for the PowerPoints to prepare their case and cannot obtain their substantial equivalent by other means.  Fed. R. Civ. P. 26(b)(3)(A)(ii).  The PowerPoints are the only evidence Watts has produced regarding ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  Plaintiffs need to – and are entitled to – use these documents to examine Watts employees in upcoming depositions.

**b.      Emails.**

Watts has also recalled three emails on the grounds that they were inadvertently produced attorney work product or privileged.  *See* Paris Decl. Ex. E.

**(1)      W0060508**

| Date | From | To | Privilege Claim | Privilege Description |
|------|------|-----|-----------------|------------------------|
| 05/05/2008 | Greenslade, Richard | Bascom, Carol | AC/AWP | Email communication from Watts risk manager to claims administrator in anticipation of litigation regarding toilet connector claim. |

Richard Greenslade is a non-lawyer in the Watts Risk Management Department.  Carol Bascom is a non-lawyer at ESIS, Inc., Watts' Claims Administrator.  The email is part of a claim file for a consumer who submitted a property damage claim to Watts through his insurer. Watts produced nineteen pages of that claim file and withheld this single email.  Watts withheld this email on the basis of the attorney-client privilege, even though the log details establish that the email is between two non-lawyers and does not reflect legal advice or the intent to seek legal advice.  Watts also claims that this document is attorney work product even though the log entry makes clear that the document is a pre-litigation communication related to a consumer's claims and

was not prepared at the direction of any attorney.  Paris Decl. Ex. R.  Watts has produced hundreds

of similar emails in connection with other claims files.

### (2)   W0019724

| Date | From | To | Privilege Claim | Privilege Description |
|---|---|---|---|---|
| 09/22/2010 | McCartney, William | Greenslade, Richard | AC | Email communication between Watts risk manager and Watts' employee summarizing attorney-client meeting agenda. |

This email is from non-lawyer William McCartney, CFO and treasurer, to non-lawyer

Richard Greenslade.  Watts withheld this document based on the attorney-client privilege only.

Paris Decl. Ex. E.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  The log establishes that no lawyer appears on the email.  The

email does not seek legal advice or the intent to seek legal advice; the email does not reflect legal

advice.  The communication is not privileged.  This email is a sharp example of how Watts has

misused attorney-client privilege and work product doctrine and why the Court should accept *in*

*camera* review of the Clawback documents.

### (3)   W0119530

| Date | From | To | Privilege Claim | Privilege Description |
|---|---|---|---|---|
| 12/13/2010 | Miller, Jeff | Lake, Paul | AC | Email between Watts' risk management and other employees relating to past and future claims and potential product liability litigation involving toilet connectors. |

Watts originally withheld this email as privileged.  Paris Decl. ¶ 17 & Ex. J.  Watts then

produced it, with related deprivileged emails, during the week of May 13, 2013, after Plaintiffs

questioned Watts' privilege claims.  *Id.*  One day later, Watts clawed it back.  The email is a good

example of Watts' loose treatment of privilege.  The email is not privileged.  Sender Jeffrey J.

Miller is an in-house patent lawyer at Watts who, according to the email, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓  The recipient, Paul Lake, is an engineer involved with the design of the new

nut.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

1        ████████████████████████████████████████████████████████   ”  The log establishes that Lake did not

2   seek legal advice from Miller and the in-house lawyer did not offer any.  Significantly, Watts has

3   already de-privileged the emails Lake forwarded.

4              **2.**      **The claims files must be produced with some exceptions.[15]**

5              Watts "claim files" are comprised of claims against the company for damages caused by

6   systemic rupture of the connectors' plastic coupling nut, by consumers or their insurers, and related

7   documents.  Paris Decl. ¶ 7.  Watts has selectively produced portions of its claims files.  *Id.*  The

8   selective production includes some communications with insurance companies, communications

9   between Risk Management, communications related to claims denials, statistics, and technical

10  reports, which it claims are "privileged," but produced subject to a stipulation.  *Id.*  Watts has not

11  explained how it determined which portions of the files it produced and which it withheld.  And

12  inconsistent with Watts' assertion of privilege, communications matching the privilege descriptions

13  for documents Watts withheld have been produced for other claim files.  Representative examples

14  show the non-legal, business nature of the claims process and the absence of lawyers involved in

15  the process.  *See* Paris Decl. Ex.M.

16              **a.**      **Materials prepared by Watts in the ordinary course of business receive**
17                     **no protection under the attorney-client privilege or the work product**
                       **doctrine.**

18              The claims files are records created in the ordinary course of business for the Watts Risk

19  Management Department.  Paris Decl. ¶ 3.  As such, they are not privileged attorney-client

20  communications, with certain exceptions[16] not challenged here, because Watts has failed to

21  demonstrate that they were reviewed by any attorney acting in his/her capacity as legal counsel as

22  opposed to that of an ordinary business person.  *See Molex v. City & County of San Francisco*, No.

23  11-cv-1282-YGR (KAW), 2012 U.S. Dist. LEXIS 70006, at *7 (N.D. Cal. May 18, 2012)  (citing

24  *HSS Enterprises, LCC v. Amco Ins. Co.*, 2008 U.S. Dist. LEXIS 11841, 2008 WL 163669 (W.D.

25

---

26        [15] *See generally* Paris Decl. Ex. K.  Plaintiffs submit that the claims files should be produced
    with these exceptions:  (i) communications that include outside counsel, (ii) legal documents in
27  draft form, and (iii) internal communications related to paying judgment for litigation or arbitration
    .

28        [16] *See* footnote 15, *supra*.

Wash. Jan. 14, 2008)) (holding that attorney-client privilege did not attach where attorneys were

acting as couriers of factual information rather than as legal advisors); *Mission Nat'l Ins. Co. v.*

*Lilly*, 112 F.R.D. 160, 163 (D. Minn. 1986) (The attorney-client privilege is "not dependent

whatsoever upon the anticipation of litigation, but instead depends upon the nature of the

relationship involved."). "It is clear that the attorney must be acting in the role of legal counsel

with respect to the information in issue before the privilege may attach. If the attorney is acting in

some other role, as an ordinary businessman for example, the privilege may not be properly

claimed." *Mission*, 112 F.R.D. at 163 (citing 8 Wright & Miller, Federal Practice Procedure, Civil,

§ 2017, p. 136 (1970 and 1986 Supp)) (additional citations omitted). Accordingly, because Watts'

has failed to produce any evidence that anyone in Watts' Risk Management Department was acting

in their capacity as an attorney when they reviewed the claims files – or even allege it in the

privilege logs – any documents they may have generated while performing tasks such as claims

adjusting, claims processing, or claim investigation monitoring are discoverable as routine business

documents that are not subject to the attorney-client privilege.

       The claims files are also not attorney work product as they were prepared in the ordinary

course of business and not in anticipation of litigation. "Cases deciding that documents were

generated in the ordinary course of business or as a result of an independent duty, have all reached

the conclusion that such reports will not receive work product protection." *Fru-Con Constr. Corp.*

*v. Sacramento Mun. Util. Dist.*, No. S-05-0583 LKK GGH, 2006 U.S. Dist. LEXIS 53763, at *13

n.3 (E.D. Cal. July 20, 2006). *See also Umpqua*, 2011 U.S. Dist. LEXIS 34088, at *14

("[d]ocuments prepared in the ordinary course of business or that would have been created in

essentially similar from irrespective of the litigation are not protectable as work product." ); *Ivy*

*Hotel San Diego, LLC v. Houston Cas. Co.*, No. 10-cv-2183-L (BGS), 2011 U.S. Dist. LEXIS

119746, at *17, 23 (S.D. Cal. Oct. 17, 2011) (granting in part motion to compel claims handling

documents and ordering *in camera* review of certain documents where it was unclear whether they

reflected attorney strategy, impressions, or opinions protected by the attorney-client privilege); *see*

*also Cox v. Zurn Pex. Inc.*, No 07-cv-3652(ADM/RLE), slip op. at 5-6 (D. Minn. July 28, 2008)

(attached as Ex. U to Paris Decl.) (finding that the majority of the documents relating to processing

of warranty claims were not protected by either the attorney-client privilege or as attorney work product because a routine investigation of a possibly resistible claim was not sufficient to immunize a document from production); *Onwuka v. Fed. Express Corp.*, 178 F.R.D. 508, 514 (D. Minn. 1997) (recognizing that any documents that would have normally been generated in the regular course would not receive work product protection); *Garcia v. City of El Centro*, 214 F.R.D. 587, 593 (S.D. Cal. 2003) ("[a] more or less routine investigation of a possibly resistible claim is not sufficient to immunize [under the work product rule] an investigative report developed in the ordinary course of business." (*quoting Janicker v. George Washington Univ*., 94 F.R.D. 648, 650 (D.D.C. 1982))); *Fru-Con Constr. Corp.*,  2006 U.S. Dist. LEXIS 53763, at *13 n.3 ("It is also well established that insurance companies have an independent obligation to review and follow up on claims, and their reports are thus not protected, although they are usually prepared with an eye toward litigation.")

Here, Watts cannot establish that its documents regarding the handling, investigation, evaluation, and processing of claims are work product because these functions are a part of Watts' normal business practices, whether or not the claim results in litigation.  The Risk Management Department at Watts is in the business of handling claims.  Watts is self-insured.  The department receives claims directly from consumers or their insurance companies and then conducts an investigation of the claims, presumably in good faith, to determine whether the product failure is the company's responsibility before arbitration or litigation is filed.  Paris Decl. ¶ 3.  This investigation is done in the ordinary course of Watts' business, and in many cases, legal action is not required to resolve the claim.  Thus, Watts' investigatory efforts relating to these claims are not subject to work product protection. To extend work product protection to such documents is contrary to long standing jurisprudence, and would render the investigative files of insurers investigating claims, including Plaintiffs' insurers here that have been produced, non-discoverable work product.

**b.  Even if the claims files were not business documents, Watts has waived any claim that they are privileged or protected by voluntary production of its claims files and injection of claims data and outcome into this lawsuit.**

Watts intends to rely on the defective toilet connector claims files to defend itself.  Watts will rely on its claims denials as evidence that "the subject toilet connectors as designed are not defective," (ECF No. 147, Aff. Def. 12 at 30:15-17), that the "toilet connectors were improperly, negligently or recklessly installed," (*id.*, Aff. Def. 12 at 31:15-19), or "misused or improperly maintained," (*id.*, Aff. Def. 27 at 34:10-15).  Watts will also point to evidence from the claims files to support its instructions and warnings for toilet connector installation.  (*Id.*, Aff. Def. 26 at 34:5-9.)  When Plaintiffs served discovery on Watts asking for information related to the rate of failure of the plastic coupling nut and the value of the claims related to those failures, Watts stated it "does not currently have full responsive information because of the lapse of time, business changes and employee turnover," and thus directed Plaintiffs to the claim's files.[17]  The defective toilet connector claims files will also be relevant to class certification to demonstrate common issues.

Having injected claims data and the claims files into the case (*see* Paris Decl. ¶ 8) and cherry-picking other portions of the same files for production, Watts' selective withholding of portions of claims files is unfair.  *Wellpoint*, 59 Cal. App. 4th at 128.

**c.  Plaintiffs have a substantial need for the withheld claims files to prepare their case and cannot obtain the substantial equivalent of the claims files elsewhere.**

Finally, Plaintiffs have a substantial need for the claims files and cannot obtain the substantial equivalent of the claims files elsewhere.  Watts has represented in written discovery that little direct evidence of toilet connector claims remains.  *See supra* at § IV.B.2.V; *see also* Paris Decl. Ex. B.  In connection with its production of technical reports relating to failed toilet connector claims, Watts also told the Court, "Watts is willing to produce these reports because they are the only remaining direct evidence regarding toilet connector claims that were presented to Watts in the past."  (ECF No. 117 at 5:17-19.)[18]  At the same time, Watts acknowledged the

---

[17] *See, e.g.*, Paris Decl. Ex B at 2:26-27.

[18] Watts produced the technical reports subject to a protective order that stated that the voluntary production of the report did not result in a work product waiver as to the subject of the reports.  Plaintiffs' preserved their right to challenge work product for the subject matter

importance of getting complete reports, rather than selective or redacted reports.  *Id*.  The same

"completeness" standard should be applied to claims files.  They should be produced, with the

except:  (i) communications that include outside counsel, (ii) legal documents in draft form, and

(iii) internal communications related to paying judgment for litigation or arbitration.  Plaintiffs

have access to no other source for this information.

> **3.**     **Communications between non-legal employees are business communications are not protected.**

Watts asserts work product protection and/or the attorney-client privilege over hundreds of

communications between two or more non-legal Watts employees or agents.  The documents fall in

two categories:  (1) communications between non-legal Watts Risk Management employees; and

(2) communications between non-legal Watts Risk Management employees and two non-legal

ESIS, Inc. employees.  A third suspect category covers documents on which Claudette Barker is an

author, recipient, or is copied.  Watts has described Ms. Barker as a former employee with a law

degree who was "embedded" in the Risk Management Department.  When a lawyer does non-legal

work, including claims, the work product is not protected.  *See Diagnostics Sys. Corp.*, 2008 U.S.

Dist. LEXIS 123915, at *31; *see also Chevron Texaco,* 241 F. Supp. 2d at 1069.  The documents

appear on both Privilege Log 1 and Privilege Log 2.  Plaintiffs provide representative examples of

Watts' claims for this category of withheld documents.  *See* Paris Decl. Exs. M, C at Nos. 51, 543,

544, 565, 574, 579, 587, 588-596, 599, 611, 620, 639, 700, 702, 759, 760, 1071.  Moreover, Watts

has produced similar documents between non-legal personnel which show the routine business

nature of such communications.  *Id*. Ex. R.

Watts has not established a legitimate basis for withholding documents in this category.

The attorney-client privilege only protects communications between non-legal employees or agents

in which the employees or agents discuss legal advice or the intent to seek legal advice.  *Chevron*

*Texaco*, 241 F. Supp. 2d at1077.  Watts does not claim, let alone establish that hundreds of

---

independent of the voluntary production.  (ECF No. 117 at 6-7.)  Plaintiffs did not—and do not—
believe the technical reports or any other part of the claims files are protected.

withheld communications between non-legal employees and agents relate to legal advice or

litigation

The "privilege descriptions" for these documents and others in this category, can be

distinguished from other entries where Watts clearly states that that the author of the

communication was seeking legal advice from counsel.  *See, e.g.*, Paris Decl. Ex. S at Nos. 221

("Handwritten note from Watts' risk management to in-house counsel seeking legal advice

regarding toilet connector claim in anticipation of litigation"), 1772 ("Handwritten note between

Watts' risk management personnel reflecting request for legal advice from outside counsel

regarding defense in active toilet connector litigation."), 1924 ("Handwritten note between Watts'

risk management personnel reflecting correspondence with outside counsel regarding defense of

active toilet connector arbitration.") and, 1936 (Handwritten note by Watts' risk management

reflecting request for legal advice from outside counsel regarding active toilet connector

litigation.).  Plaintiffs do not challenge such claims of privilege, but do challenge the hundreds of

instances where Watts does not claim that either communications between non-legal Watts Risk

Management employees, or communications between non-legal Watts Risk Management

employees and two non-legal ESIS, Inc. employees reflect legal advice or that they were prepared

at the direction of counsel.  These documents should be produced.

### 4.     Watts has improperly withheld spreadsheets comprised of factual data as "attorney work product."

Watts has withheld hundreds of spreadsheets on the basis of attorney work product, without

demonstrating that the spreadsheets and the underlying data were created at the direction of an

attorney or in anticipation of litigation.  The spreadsheets contain claims data reflecting the

business operations of the Watts Risk Management Department. Watts describes the spreadsheets

in various ways, including the following: [19]

- ▪ "[s]preadsheets containing analysis of claims," prepared by Michelle Nutter, whom
  Watts describes as a "Risk Management Assistant ("Nutter Spreadsheets").  Watts does
  not allege that Nutter created the spreadsheets at direction of counsel or in anticipation

---

[19] For the Court's convenience, Plaintiffs provide tables with examples from Privilege Log 1 (Paris Decl. Ex. D) and from Privilege Log 2 (Paris Decl. Ex. L).

of litigation; Watts does not identify any attorney or other individual who received the spreadsheets.[20]

- ▪ "Spreadsheet regarding Watts engineer's evaluation of various product claims at direction of in-house counsel and risk management," created by Robert Greenwood, a R&D Supervisor.[21]

- ▪ Watts describes a third set of spreadsheets as "[s]preadsheet created by Watts' risk management at the direction of counsel regarding connector claims." Again, Watts does not allege that either of these sets were created in anticipation of litigation; Watts does not identify any attorney or other individual who received the spreadsheets.[22]

Watts has not carried its burden to establish that any of these spreadsheets are work product. There is nothing indicating that they were created at the direction of counsel or in anticipation of litigation. Further, the facts contained in those spreadsheets are not protected for multiple reasons. First, neither the attorney-client privilege nor the work product doctrine protects disclosure of underlying facts. *Chevron Texaco*, 241 F. Supp. 2d at 1069. It is apparent from Watts' description of the spreadsheets that the data contained in the spreadsheets is factual. Second, Watts has injected the issue of claims related to its toilet connectors into this litigation. *See supra* at § IV.B.2.b. A party's injection of issue into a lawsuit results in waiver of the work product doctrine. *Wellpoint*, 59 Cal. App. 4th at 128. Third, Watts has produced similar information in other forms and therefore has waived any claim of work product or privilege. Watts has produced electronic copies of portions of its toilet connector claims files, including correspondence and data related to the amount of the claims and, in some cases settlement information.[23] In addition, Watts has produced a spreadsheet with toilet connector claims information, including claimants, claim amounts, settlement demands, and some settlement information. Paris Decl. Ex. N.

---

[20] *See* Paris Decl. Ex. D, at Nos. 271-285.

[21] *Id.* Ex. D, at Nos. 394, 395, 397.

[22] *Id*. Ex. D, at Nos. 398-477.

[23] Plaintiffs submit that Watts' reliance on its claims files in defense of this action and to respond to discovery is an independent basis to order Watts to compel complete claims files. *See supra* at § IV.B.2.b. Moreover, Watts has stated these claims files are necessary to determine a failure rate for the plastic coupling nut. *See* Paris Decl. Ex. B at 5:7-11. And to the extent Watts relies on these claims files to prepare any expert or failure rate analysis, the material is patently discoverable and was wrongfully withheld by Watts until after Plaintiffs' expert disclosures, June 3, 2013.

**5.     Watts has withheld other documents based on erroneous claims of privilege and work product.**

Watts has withheld documents, outside the categories described above, based on improper claims of privilege or work product.  Plaintiffs ask the Court to order Watts to produce these documents or, alternatively, to review them *in camera*.

**a.     Privilege Log 1, Nos. 226, 242**

| No. | Custodian | Date Sent | To | CC | Priv. Claim | Privilege Description |
|-----|-----------|-----------|-----|-----|-------------|-----------------------|
| 226 | Barker, Claudette | 10/30/2008 | Greenslade, Richard | Barker, Claudette; Day, Christopher | AC | Email between Watts' risk management and in-house counsel regarding plastic ballcock nuts. |
| 242 | Barker, Claudette | 10/30/2008 | Greenslade, Richard | Barker, Claudette; Day, Christopher | AC | Email between Watts' risk management and in-house counsel regarding plastic ballcock nuts. |

Watts claims these communications are attorney-client privileged.  Paris Decl. Ex. C. Watts does not, however, indicate that the communications are related to legal advice, even though two in-house counsel are identified on the documents (Day, Barker).  Watts had multiple opportunities to do so, in the original descriptions, in the multiple versions of the logs, and in the parties' numerous in-person conferences regarding Watts' privilege claims.  The description suggests that this communication is related to Watts business and is not legal.  Mr. Day is general counsel and compliance officer; Ms. Barker was an employee of the legal department. Communications involving in-house are not presumptively privileged.  These documents should be produced.

**b.     Privilege Log 1, Nos. 57, 58, 1098**

Watts has withheld three documents related to "labels," claiming attorney-client privilege and the work product doctrine, even though the description of the communications does not establish that the communicate related to litigation or legal advice.  Paris Decl. Ex. C.  Moreover, the in-house lawyer on the documents functions as a member of the Risk Management Department, a non-legal role.  Further, Meda Baughman, the author of two of the emails, is identified as a former "graphics supervisor," which undermines any claim that the document relates to legal

advice or litigation.  Finally, Watts has not identified James Weiskircher.  Depending on his title and company, his inclusion on the document may have destroyed any claim of privilege.  The documents should be produced.

| No. | Custodian | Date Sent | From | To | CC | Priv. Claim | Description |
|-----|-----------|-----------|------|----|----|-------------|-------------|
| 57 | Barker, Claudette | 3/31/08 | Baughman, Meda | Barker, Claudette | Weiskircher, James | AC | Email from Watts marketing to in-house counsel seeking advice regarding revisions to toilet connector labels. |
| 58 | Barker, Claudette | 4/1/08 | Baughman, Meda | Barker, Claudette | | AC | Email from Watts marketing to in-house counsel seeking advice regarding revisions to toilet connector labels. |
| 1098 | Greenslade, Richard | 3/14/08 | Martinez, Gisela | Barker, Claudette | Greenslade, Richard | AC/ AWP | Email communication between Watts' employee and in-house counsel regarding toilet connector labels. |

### c.       Privilege Log 1, Nos. 762-774

Watts has withheld 13 documents it describes as "memorandum" regarding analysis of product liability claims.  Paris Decl. Ex. C.  The custodian, author, recipient, copied recipients, and privilege description for each are identical.  The dates differ.  This is an example:

| No. | Custodian | Date Sent | To | CCs | Privilege Claim |
|-----|-----------|-----------|----|----|-----------------|
| 762 | Greenslade, Richard | 8/5/2005 | Ouellette, Wayne | O'Keefe, Pat; Merchant, Bill; Taufen, Les; Prokop, Elaine; Stumm, Kevin; Elliott, Ernie; McVay, Lynn; Lacourciere, Paul; Lambert, Randy; Polofsky, Jeff; Jalbert, Jim; Sheets, Cameron; Bolduc, Robin; Palotta, John; Snow, Barbara; Scilingo, Jeff; Horton, Tom; Gardner, Kimberly; Greenslade, Richard | AC/AWP |

Watts identifies Mr. Oulette as Vice President of Product Liability Claims and Mr. McCartney as the company's former CFO and Treasurer.  Neither is a lawyer, according to Watts-provided evidence.  To Plaintiffs' knowledge, the sole lawyer on the memoranda is Les Taufen, whom Watts has identified as the company's former general counsel and secretary.  The description does not indicate that the documents relate to legal advice or litigation.  There are many reasons short of legal advice or litigation that a company with Watts' product lines, and claims related to those product lines, would analyze product liability claims.  *See supra* at § IV.B.  These

1    documents should be produced as ordinary business documents or, alternatively, the Courts should

2    review them *in camera* to evaluate Watts' claims.

3                                    **V.      CONCLUSION**

4           Watts has abused the privilege log process, the attorney-client privilege, and the work

5    product doctrine to suppress discoverable information.  The abuse has created an inordinate amount

6    of unnecessary work for Plaintiffs, Watts, and, now, the Court.  It has also diverted attention and

7    resources from the merits of the parties' dispute.  Plaintiffs ask the Court:  (1) to compel production

8    of the categories of documents detailed herein; or, alternatively, to accept *in camera* review of the

9    categories in order to evaluate Watts 'claims; and (2) to accept *in camera* review of the Clawback

10   Documents.

11   Date:  June 11, 2013                    By:    */s/ Simon Bahne Paris*
12                                                   Simon Bahne Paris

13                                           Patrick Howard
14                                           Charles J. Kocher
                                             **SALTZ, MONGELUZZI, BARRETT &**
15                                           **BENDESKY, P.C.**
                                             One Liberty Place, 52nd Floor
16                                           1650 Market Street
                                             Philadelphia, PA 19103
17                                           Tel:    (215) 575-3986
                                             Email: sparis@smbb.com
18                                                   phoward@smbb.com
                                                     ckocher@smbb.com
19
20                                           *Interim Lead Counsel for the Putative Classes*

21
22   Date:  June 11, 2013                    By:    */s/ Anthony D. Shapiro*
                                                    Anthony D. Shapiro
23                                           **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                             1918 Eighth Avenue, Suite 3300
24                                           Seattle, WA  98101
                                             Tel:    (206) 623-7292
25                                           Email: tony@hbsslaw.com

26                                           *Interim Class Counsel*

27

28

Date:  June 11, 2013            By:   _/s/ Todd A. Seaver_____
                                         Todd. A. Seaver

                                Joseph J. Tabacco, Jr.
                                **BERMAN DEVALERIO**
                                One California Street, Suite 900
                                San Francisco, CA 94111
                                Tel:     (415) 433-3200
                                Email: jtabacco@bermandevalerio.com
                                         tseaver@bermandevalerio.com

                                *Liaison Counsel for the Putative Classes*


                        **E-Filing Attestation**

        I, Todd A. Seaver, am the ECF User whose ID and password are being used to file this

document.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the

signatories identified below has concurred in this filing.


                                */s/ Todd A. Seaver*_____
                                Todd A. Seaver